**PAC FUNG FEATHER CO., LTD. and Natural Feather & Textiles, Plaintiffs–Appellants,**

v.

**The UNITED STATES, Defendant–Appellee.**

No. 96–1211.

United States Court of Appeals, Federal Circuit.

April 8, 1997.

Before NEWMAN, MAYER, and BRYSON, Circuit Judges.

MAYER, Circuit Judge.

Pac Fung Feather Company, Ltd. and its United States selling agent, Natural Feather & Textiles, Inc., appeal the United States Court of International Trade's summary judgment, *Pac Fung Feather Co., Ltd. v. United States*, 911 F.Supp. 529 (1995), upholding the United States Customs Service's rules of origin for textile and apparel products. We affirm.

*Background*

Section 334(b) of the Uruguay Round Agreements Act sets out principles for determining the country of origin of textiles and apparel products imported into the United States. *See* Pub.L. No. 103–465, 108 Stat. 4809 (1994) (codified at 19 U.S.C. § 3592(b)). Section 334(a) of the Act directs the Secretary of the Treasury to promulgate rules to implement section 334(b)'s principles. § 334(a), 108 Stat. at 4949. Accordingly, the Customs Service promulgated Rules of Origin for Textile and Apparel Products (Rules), 60 Fed.Reg. 46,188 (1995) (codified at 19 C.F.R. § 102.21 (1996)), on September 5, 1995. In relevant part, the Rules deem any textile or apparel article comprised of materials from a single country and classified under headings 5609, 5807, 5811, 6213, 6214, 6301–6306, or 6308 or subheadings 6209.20.50.40, 6307.10, 6307.90, or 9404.90 of the Harmonized Tariff Schedule of the United States (together, the enumerated headings and subheadings) to originate in the "country, territory, or insular possession" where the article's component fabric, staple fibers, or continuous filaments were made. *See* 19 C.F.R. § 102.21(e).*

John M. Peterson, Neville, Peterson & Williams, New York City, argued for plaintiffs–appellants. With him on the brief were George W. Thompson and Arthur K. Purcell.

Rhonda K. Schnare, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, DC, argued for defendant–appellee. With her on the brief were Frank W. Hunger, Assistant Attorney General, and David M. Cohen, Director.

* Specifically, under 19 C.F.R. § 102.21(e), (1) "[i]f of continuous filaments, including strips, the country of origin of a good classifiable under heading 5609 is the country, territory, or insular possession in which those filaments, including strips, were extruded," and (2) "[i]f of staple fibers, the country of origin of a good classifiable under heading 5609 is the country, territory, or insular possession in which those fibers were spun into yarns." Furthermore, (3) "[t]he country of origin of a good classifiable under heading 6308 is the country, territory, or insular possession in which the woven fabric component of the good was formed by a fabric-making process," and (4) "[t]he country of origin of a good classifiable under" any one of the remaining enumerated headings and subheadings "is the country, territory, or insular possession in which the fabric comprising the good was formed by a fabric-making process."

Pac Fung manufactures home textile and bedding goods in Hong Kong, Macau, and the People's Republic of China. During 1994 and 1995, Pac Fung exported to the United States more than $50 million worth of merchandise (1) manufactured in Hong Kong or Macau, (2) comprised entirely of Chinese-woven fabric, (3) categorized under the enumerated headings and subheadings, and (4) identical to articles classified under category 362, the United States' import quota category for various cotton bedding articles deemed to originate in China. Before the Rules became effective on July 1, 1996, Customs considered these products to have originated where Pac Fung assembled them—in Hong Kong or Macau. The Rules now deem the merchandise to come from China, *see* 19 C.F.R. § 102.21, thereby subjecting it to an absolute quota limit for category 362 articles, *see* Agreement Concerning Trade in Textile and Apparel Products, March 29–June 8, 1995, U.S.–P.R.C., Hein's No. KAV 4284, Temp. State Dep't No. 95–148 (setting import quotas); Establishment of Import Limits for Certain Cotton, Wool, Man–Made Fiber, Silk Blend and Other Vegetable Fiber Textiles and Textile Products and Silk Apparel Produced or Manufactured in the People's Republic of China, 62 Fed.Reg. 6950 (1997) (same).

Alleging that the Rules are "arbitrary, capricious, an abuse of discretion, and not in accordance with the law," the importers sued in the Court of International Trade to enjoin the government from implementing and enforcing them. Holding that the Rules comply with section 334(b), the court entered judgment for the United States. The importers appeal.

### Discussion

■ As a threshold matter, the government argues that the Court of International Trade lacked jurisdiction under 28 U.S.C. § 1581(i) because the importers failed to establish the manifest inadequacy of 28 U.S.C. § 1581(h), here a prerequisite for section 1581(i)'s entirely residual jurisdiction, *see Miller & Co. v. United States,* 824 F.2d 961, 963 (Fed.Cir.1987) ("Section 1581(i) jurisdiction may not be invoked when jurisdiction under another subsection of § 1581 is or could have been available, unless the remedy provided under that other subsection would be manifestly inadequate.").** We disagree. Section 1581(h) gives the Court of International Trade "exclusive jurisdiction of any civil action commenced to review, prior to the importation of the goods involved, a ruling issued by the Secretary of the Treasury, or a refusal to issue or change such a ruling, relating to classification ... or similar matters." As the trial court correctly held, the preordained ruling available to the importers under section 1581(h) would be manifestly inadequate. When promulgating the rules, Customs unmistakably indicated how it would determine the origin if, for example, "a fabric is woven in one country and wholly assembled in a second country"; thus, obtaining a ruling would be a mere formality. *See* Rules of Origin for Textile and Apparel Products (Rules), 60 Fed.Reg. at 46,192 (explaining that Customs modified the rules to preclude assembly from conferring origin).

■ Section 1581(i) was the importers' only available and potentially adequate option. That section confers upon the Court of International Trade "exclusive jurisdiction of any civil action commenced against the United States ... that arises out of any law of the United States providing for ... (3) embargoes or other quantitative restrictions on the importation of merchandise ...; or (4) administration and enforcement with respect to the matters referred to in [paragraph 3]." This case arises out of the Uruguay Round Agreements Act. Section 333 of the Act, which amended the Tariff Act of 1930, 46 Stat. 590 (1930), authorizes the President "to publish a list of countries in which illegal activities have occurred involving ... activities designed to evade quotas ... on textile or apparel products, if those countries fail to demonstrate a good faith effort to cooperate ... in ceasing such activities." *See* § 333,

---

** The government also contends that the importers lack standing. We agree with the trial court's view that the importers allege sufficient injury to confer standing. *See American Ass'n of*

*Exporters and Importers–Textile and Apparel Group v. United States,* 751 F.2d 1239, 1246 (Fed.Cir.1985).

108 Stat. at 4949. By authorizing such a penalty, the Uruguay Round Agreements Act, on its face, provides for the administration or enforcement of quantitative restrictions and satisfies the requirements of 28 U.S.C. § 1581(i)(4).

■ Having established jurisdiction, the importers allege that the Rules do not comply with section 334(b). Section 334(b) consists of a "general rule," a "special rule," and a "multicountry rule." Paragraph (b)(1), the general rule, provides,

> Except as otherwise provided for by statute, a textile or apparel product . . . originates in a country, territory, or insular possession . . . if—(A) the product is wholly obtained or produced [there]; (B) the product is a yarn, thread, twine, cordage, rope, cable, or braiding [made there]; (C) the product is a fabric [made there] by any . . . fabric-making process . . .; or (D) the product is any other textile or apparel product that is wholly assembled [there] from its component pieces.

19 U.S.C. § 3592(b)(1). Subparagraph (b)(2)(A), the relevant portion of the special rule, qualifies paragraph (b)(1). Specifically addressing goods classified under the enumerated headings and subheadings, it adds that "[n]otwithstanding paragraph (1)(D)— . . . the origin of a good that is classified under one of the [enumerated headings and subheadings] . . . shall be determined under subparagraph (A), (B), or (C) of paragraph (1), *as appropriate.*" *Id.* § 3592(b)(2)(A) (emphasis added).

This case turns on the meaning of "as appropriate" in section 334(b)(2)(A). The government contends that "as appropriate" means "most suitable." In contrast, the importers argue that "[t]o the extent that the Special Rule 'borrows' certain parts of the General Rule 'as appropriate', it reflects a Congressional understanding that some of the goods classified under the Special Rule headings *can* be 'wholly obtained or produced in a single country', or *can* be 'yarns, threads, etc. or fabrics'." In other words, the importers define "as appropriate" to preclude determining the origin of a good falling under the enumerated headings and subheadings if the product does not fall literally under (A), (B), or (C) of section 334(b)(1): "as appropriate" means "only if appropriate."

However, the importers' definition unravels its statutory meaning. Neither party disputes that (A), (B), and (C) of section 334(b)(1) each determines origin according to its respective, literal terms. In fact, were section 334(b)(2)(A) to incorporate (A), (B), and (C), without adding "as appropriate," the section concomitantly would include each subparagraph's literal limits. The words "as appropriate," as defined by the importers, therefore cannot restrict the classification to the literal terms of (A), (B), and (C). The remainder of section 334(b)(2)(A) already does. To add language meaning "only if appropriate" would be redundant.

■ "The cardinal principle of statutory construction is to save and not to destroy." *National Labor Relations Bd. v. Jones & Laughlin Steel Corp.,* 301 U.S. 1, 30, 57 S.Ct. 615, 621, 81 L.Ed. 893 (1937). We must "give effect, if possible, to every word and clause of a statute." *Inhabitants of Montclair v. Ramsdell,* 107 U.S. 147, 152, 2 S.Ct. 391, 395, 27 L.Ed. 431 (1883). For all intents and purposes, the importers' definition of "as appropriate" nullifies the effect of section 334(b)(2)(A).

On the other hand, defining "as appropriate" as "most suitable" permissibly expands the literal terms of (A), (B), and (C). As we read the statutory scheme, the country of origin must be determined by whichever of section 334(b)(1)(A), (B), or (C) is best fitted to the product. We do not subscribe to the importers' view that because the condition of the product as imported is beyond the form of fiber or fabric, it is inappropriate to invoke subparagraphs (A), (B), or (C) at all, thereby throwing the matter under the more advantageous multicountry assembly rule of section 334(b)(3).

*Conclusion*

Accordingly, the judgment of the Court of International Trade is affirmed.

*AFFIRMED.*