**NEC CORPORATION and HNSX Supercomputers, Inc., Plaintiffs–Appellants,**

**v.**

**UNITED STATES and Department of Commerce, Defendants–Appellees,**

**and**

**Cray Research, Inc., Defendant–Appellee.**

No. 98–1020.

United States Court of Appeals, Federal Circuit.

Aug. 7, 1998.

---

Robert E. Montgomery, Jr., Paul, Weiss, Rifkind, Wharton & Garrison, Washington, DC, argued for plaintiffs–appellants. With him on the brief were Terence J. Fortune, Robert P. Parker, David J. Weiler, and Swati Agrawal.

Lucius B. Lau, Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, argued for defendants–appellees, United States and Department of Commerce. With him on the brief were Frank W. Hunger, Assistant Attorney General, David M. Cohen, Director, and A. David Lafer, Senior Trial Counsel. Of counsel were Berniece A. Browne, Patrick V. Gallagher, David W. Richardson, and Stephen J. Powell, U.S. Department of Commerce, Washington, DC.

Michael L. Burack, Wilmer, Cutler & Pickering, Washington, DC, argued for defendant–appellee, Cray Research, Inc. With him on the brief were John D. Greenwald, Stuart M. Weiser, and Amber L. Cottle.

Before NEWMAN, Circuit Judge, SKELTON, Senior Circuit Judge, and PLAGER, Circuit Judge.

PLAGER, Circuit Judge.

This challenge to the Department of Commerce's ("Commerce's") administration of the antidumping laws arises in a somewhat unusual way: plaintiffs-appellants NEC Corporation and HNSX Supercomputers, Inc. (collectively "NEC") seek to enjoin Commerce from conducting an antidumping investigation involving certain supercomputers from Japan. NEC alleges that the deciding officials in Commerce had prejudged the outcome, and therefore were Constitutionally disqualified from proceeding with the investigation. The Court of International Trade denied NEC's petition for an injunction and declaration of rights, and Commerce proceeded to complete its investigation; following which, as NEC feared, Commerce determined that the proposed sales of the Japanese supercomputers were being made at less-than-fair value. NEC appeals the de-

cision of the Court of International Trade denying the petition for injunction and declaratory judgment.[1]

## BACKGROUND

### 1.

In order to appreciate the gravamen of NEC's complaint, it is necessary to examine in some detail the history of the challenged procurement, and the involvement of various political officials and actors. Though the parties dispute exactly what happened, and the meaning to be attributed to some of the events, the following facts seem to have been established.

The story begins with the decision by the University Corporation for Atmospheric Research ("UCAR") to procure advanced supercomputers for its National Center for Atmospheric Research ("NCAR"). In March 1995, UCAR solicited bids for advanced supercomputers from three supercomputer manufacturers—Federal Computing Corporation ("FCC"); Cray Research, Inc. ("Cray"); and Fujitsu Limited. FCC offered to provide NEC supercomputers, while the other two manufacturers offered to supply their own.

UCAR is a research consortium funded in part by the National Science Foundation ("NSF"), an agency of the United States Government. Under the terms of its Cooperative Agreement with NSF, UCAR was required to obtain NSF approval for the supercomputer acquisition. As part of this approval process, NSF requested that UCAR obtain evidence that NEC's[2] offer did not involve dumping, as that term is understood under United States antidumping laws.[3] In response to that directive, UCAR commissioned a study by Dr. Lloyd Thorndyke to analyze NEC's offer. Dr. Thorndyke ultimately concluded that there was no dumping, although he did not consider the effect of

research and development costs in his analysis.

Meanwhile, the Department of Commerce decided to look into the matter. Even though NSF did not request that Commerce undertake an antidumping analysis of the UCAR procurement, Commerce undertook a preliminary analysis of NEC's bid. As part of that process, Susan Esserman, Assistant Secretary of Commerce for Import Administration, assembled a team of Import Administration ("IA") officials on April 3, 1996 to collect and analyze NEC's bid data. Three weeks later, on April 24, 1996, Ms. Esserman convened an interagency meeting to obtain technical information on supercomputers and hear a presentation by NSF on the UCAR procurement.

On May 13, 1996, Ms. Esserman, by now Commerce's Acting General Counsel, convened another interagency meeting with senior officials of NSF and other agencies to discuss the results of Commerce's preliminary analysis. The fact of this meeting and what transpired there is one of the sources of contention among the parties.

A few days later, on May 17, 1996, Stuart Eizenstat, Under Secretary for International Trade, and Ms. Esserman met with officials of the National Economic Council to discuss the matter. At that meeting, Mr. Eizenstat and Ms. Esserman provided a short, factual briefing on the UCAR procurement and the IA inquiry.

At about the same time, Brian Mannion, Grants and Agreements Officer at NSF, decided to reiterate to UCAR NSF's concern about the possibility of dumping, based on the meetings with Commerce. In a letter dated May 17, 1996, Mr. Mannion informed UCAR of the results of those meetings:

> UCAR has provided NSF with several documents that addressed the "antidumping" issue. Subsequently, officials at the Department of Commerce, which has statutory responsibility for administering relevant

---

1. Subsequent to Commerce's determination, the International Trade Commission determined that an industry in the United States is threatened with material injury by reason of these imports. That determination has been challenged by NEC, *see* CIT No. 97–11–01967.

2. Even though FCC was the actual bidder, we will refer to FCC as NEC because NEC was and is the real party in interest throughout.

3. *See generally* 19 U.S.C. § 1673 (1994) et seq.

provisions of the antidumping laws, have advised NSF that they have performed a "constructive analysis" of the proposal with the best performance characteristics. They have reached the preliminary conclusion that the proposal does not constitute an offer at "fair value."

NSF accordingly encouraged UCAR to give the antidumping issue "due consideration" before concluding final negotiations.

Undeterred by NSF's letter, on May 20, 1996, UCAR announced that it had selected NEC's bid to supply a system of four FCC 32 processor SX–4 vector supercomputers. (Each computer would cost about $13.25 million for the first year of the procurement.). According to UCAR, the NEC systems "provide a distinct technical advantage compared to the systems offered by the other vendors."

On the same day, Commerce transmitted to NSF a letter from Acting Assistant Secretary Paul Joffe to Dr. Neal Lane, Director of NSF (this became known as "the Joffe letter"). In that letter, Mr. Joffe stated:

> Using standard methodology prescribed by the antidumping law, we estimate that the cost of production of one of the foreign bidders is substantially greater than the funding levels projected by NCAR's request for proposals. In antidumping law terms, this means that the "dumping margin," that is, the amount by which the fair value of the merchandise to be supplied exceeds the export price, is likely to be very high.

The letter also stated that Commerce had "significant concern that importation of the NCAR supercomputer system would threaten the U.S. supercomputer industry with material injury within the meaning of the antidumping law." Thus, Commerce apparently concluded based on its analysis that all the conditions for assessing an antidumping duty were present.

This was confirmed in another letter sent by Mr. Joffe to Dr. Lane, which included a "Predecisional Memorandum" outlining Commerce's methodology. The Predecisional Memorandum estimated NEC's dumping margin to be in the range of 163.38% to 280%. Commerce's analysis was not based on actual NEC pricing data. Instead, it was based on information gleaned from various governmental sources, including the Thorndyke study and NEC financial statements. At NSF's suggestion, Commerce gave NSF authorization to forward a copy of the Predecisional Memorandum to NEC, UCAR and NCAR.

Commerce then made a copy of the Joffe letter available to the press and public, including NEC's competitor Cray. The letter was reproduced in *Inside U.S. Trade*, an industry periodical, on May 24, 1996. The Predecisional Memorandum, which had been given only limited distribution within the Government, was published in *Inside U.S. Trade* several months later. No one admitted to having leaked it.

On June 5, 1996, Robert LaRussa succeeded Mr. Joffe as Acting Assistant Secretary of Commerce for Import Administration. Prior to that time, Mr. LaRussa had no involvement with the UCAR procurement. Two days later, Gary Taverman, an Office Director of Enforcement Group I within the IA, briefed Mr. LaRussa on IA's involvement in the UCAR procurement. At that time, Mr. LaRussa also read the Joffe letter, but seemingly he did not read the Predecisional Memorandum itself. From then until submission of this case, Mr. LaRussa had no communication with either Mr. Eizenstat or Ms. Esserman relating to the preparation, dissemination, purpose or content of the Predecisional Memorandum or regarding Cray's petition, discussed *infra*. What advice Mr. Eizenstat did give Mr. LaRussa related to general procedures in pending investigations.

At this point congressional involvement became part of the mix. On June 5, 1996, three officials of Commerce—Mr. Joffe, now a Senior Advisor to the Assistant Secretary for IA, Stephen J. Powell, Chief Counsel for IA, and Mr. Taverman—met with staff members from the House of Representatives Ways and Means Committee to discuss the UCAR procurement. At that meeting, Mr. Taverman explained Commerce's antidumping analysis. He prefaced his remarks by indicating that the results were just an "estimate" taken from public information and other governmental sources. Mr. Taverman stressed that

Commerce had not made a dumping determination. The three had a similar meeting with the House Science Committee the next day.

On June 11, 1996, Ms. Esserman, Mr. Powell, Mr. Joffe, Mr. Taverman, and Mr. La-Russa met with Representative David E. Skaggs, at his request, to discuss the UCAR procurement. Representative Skaggs represents the congressional district in which UCAR and NCAR are located. At that meeting, Mr. Taverman again explained Commerce's analysis, but this time in very general terms.

Not long after, on June 20, 1996, Mr. William F. Rawson, Vice President for Finance and Administration of UCAR, responded to Mr. Mannion's letter of May 17. In his letter, Mr. Rawson indicated that UCAR had asked NEC to comment upon Commerce's May 20, 1996, Predecisional Memorandum. UCAR had also, according to Mr. Rawson, previously retained its own experts to independently verify Commerce's analysis. Based on UCAR's own analysis, it concluded that NEC's offer was not at less-than-fair value and that an award to NEC would fully comply with its Cooperative Agreement with NSF.

The move in NEC's favor was short lived. Faced with the conflicting reports from UCAR and Commerce, Dr. Lane wrote Secretary of Commerce Michael Kantor requesting his comments on UCAR's report. Dr. Lane asked Secretary Kantor to inform NSF whether or not Commerce intended to self-initiate an official investigation.

On July 29, 1996, Cray filed an antidumping petition with Commerce and the International Trade Commission ("Commission" or "ITC") against vector supercomputers from Japan. Cray executives and its attorneys had previously met with IA staff for pre-petition counseling. Commerce responded on August 19, 1996, by initiating the supercomputer investigation. *See Vector Supercomputers from Japan,* 61 Fed.Reg. 43,527 (Dep't Commerce 1996) (initial antidumping investigation). The investigation was assigned to IA's Office of Antidumping and Countervailing Duty Enforcement Group II.

In light of Commerce's initiation of an antidumping duty investigation, NSF decided to hold off approval of a contract award to NEC. Dr. Lane, in a press release, stated that he felt it would be "inappropriate for NSF to approve this procurement until the dumping issue has been resolved," and "inconsistent with the responsible stewardship of taxpayer monies." His sentiments reflected those expressed by some in Congress. *See* H.R.Rep. No. 104–628, at 124–29; 142 Cong. Rec. H6905–02, H6906–07 (1996).

NEC responded by writing to Mr. Eizenstat informing him that NEC had requested that Commerce's Inspector General ("IG") investigate the circumstances surrounding Commerce's involvement in the UCAR procurement, including the release of confidential NEC data to Cray. NEC also requested that Commerce stay its investigation of NEC pending the outcome of the IG's investigation. To allow the investigation to go forward in light of these accusations, according to NEC, "would constitute an egregious and irreparable denial of due process." Mr. Eizenstat referred the letter to Ms. Esserman with instructions that she "draft a response to this outrageous letter." That response denied NEC's request to stay the investigation.

The Chairman of the ITC on September 12, 1996 notified the Secretary of Commerce that the Commission had made an affirmative determination in the preliminary injury phase of the antidumping investigation. *See Vector Supercomputers from Japan,* 61 Fed. Reg. 50,331 (Int'l Trade Comm'n 1996) (preliminary injury determination). Accordingly, on September 30, 1996, Commerce sent NEC and Fujitsu an antidumping questionnaire.

NEC filed the present suit in the Court of International Trade on October 15, 1996. In its suit, NEC sought to enjoin Commerce's investigation of vector supercomputers from Japan on the grounds that its due process rights were violated. In particular, NEC alleged that "Commerce has revealed itself as a partisan ally of NEC's competitor [Cray] for the UCAR contract, and has rendered itself constitutionally incapable of adjudicating the merits of Cray's dumping allegation." NEC asserted that, by Commerce's actions,

it "has deprived NEC and HNSX of their right to a determination by a fair and neutral decision-maker."

On the same day it filed suit, NEC wrote to Secretary Kantor informing him that NEC intended to "respectfully withhold their response to the Department questionnaire until such time as a qualified independent party, who is impartial and has not prejudged the matter, is appointed as a 'special master' to conduct the investigation." NEC has remained true to its word.

Subsequently, Commerce assigned a dumping duty of 454 percent against NEC on importation of supercomputers from Japan. *See Vector Supercomputers from Japan,* 62 Fed.Reg. 45,623, 45,625 (Dep't Commerce 1997). That assessment has since become final. *See Vector Supercomputers from Japan,* 62 Fed.Reg. 55,392 (Dep't Commerce 1997). NEC thereafter filed a complaint in the Court of International Trade under 28 U.S.C. § 1581(c), challenging the ITC's final determination that vector supercomputers from Japan threaten to cause a material injury to a domestic industry.

### 2.

Before the trial court, defendants—the United States, the Department of Commerce, and Cray Research, Inc.—moved to dismiss the complaint in this case for lack of jurisdiction and failure to state a claim. Specifically, the defendants argued that jurisdiction was not proper under 28 U.S.C. § 1581(i) because NEC had an adequate remedy under 28 U.S.C. § 1581(c), and therefore the statutorily-available procedure required that NEC await the conclusion of the investigation, and bring any court action at that time. The trial court denied defendants' motion.

The trial court on March 21, 1997 held a hearing on NEC's motion for a preliminary injunction; the court denied that motion. The court thereafter considered NEC's petition for permanent injunction at a three day trial, conducted on April 14, 15, and 21, 1997. In its ensuing Judgment and Opinion, dated August 20, 1997, the trial court rejected NEC's claim that Commerce's conduct constituted prejudgment having the effect of denying NEC due process under the Fifth Amendment. The court concluded that NEC had no legally cognizable property or liberty interest that could have been deprived by Commerce's actions.

However, the trial court did recognize a statutory prejudgment claim. To prevail on this claim, the court required NEC to prove that Commerce's prior actions rendered the antidumping investigation a "hollow formality" such that "plaintiff's participation in the administrative process would be futile." The court imposed this heavy burden in light of the presumption of honesty and integrity that governmental decision makers enjoy under the law and the investigatory (versus adjudicatory) nature of the antidumping investigation. NEC's burden in this case was even heavier, according to the trial court, because a new decision maker assumed the helm of the investigation. The court found that NEC failed to satisfy this heavy burden, and entered judgment for the defendants. NEC now appeals.

### DISCUSSION

On the merits, the parties disagree about what is the proper legal standard for judging the "prejudgment" behavior of the Commerce Department. NEC claims it is entitled to full protection under Constitutional Due Process, specifically to the right to an unbiased decision maker in fact and in appearance. The Government supports the trial judge's view that a lower standard is appropriate when Commerce is engaged in an antidumping matter. The lower standard, inferred from the statutes which govern import policy, requires only that the procedures and hearing which lead to the decision be fair, and not a "hollow formality."

NEC further complains that the trial court, though it recited the litany of facts summarized above, narrowed its focus when assessing Commerce's conduct to just two events, Ms. Esserman's presentation at the May 13 interagency meeting, and the May 20 Joffe letter and Predecisional Memorandum. Had the trial court kept the entire history in focus, argues NEC, the conclusion of improper prejudgment would be unavoidable under any standard. The Government responds

that the trial court's focus was entirely correct because no other evidence in the case would arguably support NEC's prejudgment claim.

And finally, the parties quarrel over the constraints the trial court placed on the obtaining of testimony from certain high-ranking government officials. NEC complains that it was improperly hindered in efforts to make its case, while the Government defends the trial court's handling of the matter as well within the discretion granted to courts in such matters.

If that is not enough, the Government devotes much of its effort on appeal to the proposition that the trial court was without jurisdiction to hear NEC's petition in the first instance, since a suit against the United States requires consent, and the statutes governing the Court of International Trade, when properly read, do not contain that consent. The Government contends here, as they did in their motion to dismiss at the trial level, that the trial court improperly exercised jurisdiction over this case under 28 U.S.C. § 1581(i). As an adjunct to the jurisdictional argument, defendant Cray argues that this appeal is moot because the investigation which NEC sought to enjoin in this case has now been completed.

## A.

We first address the jurisdiction question. Chapter 95 of Title 28 of the United States Code, entitled "Court of International Trade," contains Congress' jurisdictional grant to the court. The first section of the chapter is § 1581, "Civil actions against the United States and agencies and officers thereof," and consists of subsections (a) through (j). Subsections (a) through (h) assign exclusive jurisdiction to the Court of International Trade regarding civil actions against the United States in a variety of matters affecting foreign commerce, including the antidumping laws. Subsection (i) contains what has been called a residual provision that grants to the Court of International Trade exclusive jurisdiction over "any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing

for —(4) administration and enforcement with respect to the matters referred to in ... subsections (a)-(h) of this section." 28 U.S.C. § 1581(i)(4) (1994).

The subsection contains a caveat: subsection (i) "shall not confer jurisdiction over an antidumping or countervailing duty determination which is reviewable ... by the Court of International Trade under section 516A(a) of the Tariff Act of 1930." *Id.* In light of this caveat, this court has interpreted the jurisdiction provided by subsection (i) to be available only when jurisdiction under another subsection of 1581 is either unavailable or, if available, "manifestly inadequate." *See Shakeproof Indus. Prod. Div. v. United States,* 104 F.3d 1309, 1312 (Fed.Cir.1997); *Miller & Co. v. United States,* 824 F.2d 961, 963 (Fed.Cir.1987). At the time that NEC filed its complaint, it could not invoke the trial court's § 1581(c) jurisdiction because the antidumping investigation had not yet been completed. Nevertheless, because subsection (c) specifically provides for review of any civil action commenced under section 516A of the Tariff Act of 1930, argues the Government, NEC should have waited until Commerce completed its review, and then raised its due process concerns. The trial court rejected the Government's view, and characterized the suggested approach as a "fools errand."

The trial court is correct. Requiring NEC to appeal from the conclusion of an investigation that, allegedly, was preordained because of impermissible prejudgment is a classic example of a remedy that was "manifestly inadequate." *See Pac Fung Feather Co. v. United States,* 111 F.3d 114, 116 (Fed.Cir. 1997) ("[T]he preordained ruling available to importers under section 1581(h) would be manifestly inadequate."); *Hylsa v. United States,* No. 97–12–02168, 1998 WL 51731, at *3 (Ct. Int'l Trade, Feb. 3, 1998) (when a plaintiff alleges that the outcome is preordained, the case "is the very type of situation which is intended to be addressed under 28 U.S.C. § 1581(i)"); *Luggage & Leather Goods Mfrs. of Am. v. United States,* 588 F.Supp. 1413, 1420–21 (Ct. Int'l Trade 1984); *United States Cane Sugar Refiners' Ass'n v. Block,* 544 F.Supp. 883, 887 (Ct. Int'l Trade

1982), *aff'd on other grounds,* 69 C.C.P.A. 172, 683 F.2d 399 (1982). This is not a case in which NEC is attempting to "sail past carefully constructed limitations simply by invoking other and more general legislation." *National Corn Growers Ass'n v. Baker,* 840 F.2d 1547, 1558 (Fed.Cir.1988); *see St. Paul Fire & Marine Ins. Co. v. United States,* 959 F.2d 960, 963–64 (Fed.Cir.1992) (finding jurisdiction proper under 1581(i)). Instead, NEC is attempting to adjudicate an issue that goes to the very heart of the administrative system—neutrality—using the only adequate avenue available. *See McCarthy v. Madigan,* 503 U.S. 140, 148, 112 S.Ct. 1081, 117 L.Ed.2d 291 (1992) ("[A]n administrative remedy may be inadequate where the administrative body is shown to be biased or has otherwise predetermined the issue before it.").

■ With regard to Cray's argument that the case is moot and the appeal should be dismissed because the proceeding NEC sought to enjoin has been concluded, we think otherwise. Article III limits federal judicial power to cases or controversies. *See* U.S. Const. art. III, § 2. If a case becomes moot it no longer presents a justiciable controversy over which a federal court may exercise jurisdiction. *See Kimberly–Clark Corp. v. Procter & Gamble Distrib. Co.,* 973 F.2d 911, 913 (Fed.Cir.1992). "A case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack,* 395 U.S. 486, 496, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969).

■ However, even if an intervening event satisfies some of the plaintiff's concerns, the case is not moot if other consequences of defendants' actions remain. *See Church of Scientology v. United States,* 506 U.S. 9, 13, 113 S.Ct. 447, 121 L.Ed.2d 313 (1992); *Ganadera Ind., S.A. v. Block,* 727 F.2d 1156, 1158 (D.C.Cir.1984). In their complaint, NEC sought the following relief:

> Plaintiffs pray ... that this Court issue a permanent injunction enjoining the defendants ... from making any determination on the merits in the proceeding styled Vector Supercomputers from Japan, Inv. No. A–588–841, *and from such other acts and practices as would deprive plaintiffs of their due process rights* [.]

(Emphasis added). Thus, even though the investigation sought to be enjoined is now complete and the final dumping order has been issued, the question remains whether there are other consequences remaining from Commerce's actions for which the trial court could fashion a remedy.

The final dumping order requires NEC to post a cash deposit of 454 percent of the sales price at the time the entries are made. *See* 62 Fed.Reg. 55,392. If this deposit rate was arrived at in violation of NEC's due process rights this would qualify as "such other acts" that the trial court could enjoin if the court were to rule in its favor. Because the trial court could still fashion a useful remedy in this case by granting prospective relief from the effects of the antidumping order, the case is not moot. *See Church of Scientology,* 506 U.S. at 13, 113 S.Ct. 447. The cases cited by Cray in its brief all stand for the unremarkable proposition that a case is rendered moot by the conclusion of an administrative proceeding when the *only* remedy sought by the plaintiff is to enjoin the proceeding. That is not the case here. *See Ganadera,* 727 F.2d at 1158.

### B.

We turn now to the merits. The first question we must answer is: Does NEC have a right to some form or level of due process? The trial court, in light of Congress' plenary power over foreign commerce, rejected NEC's constitutional due process claim. Specifically, the court held that NEC lacked a legally cognizable liberty or property interest in its pending antidumping investigation that could be unconstitutionally deprived. NEC asserts that the trial court misconstrued the nature of NEC's claim. The trial court, according to NEC, mischaracterized NEC's claim as a substantive due process challenge rather than a procedural one.

### 1.

■ Indisputably, engaging in foreign commerce is not a fundamental right protected by notions of substantive due process.

*See Buttfield v. Stranahan,* 192 U.S. 470, 492–93, 24 S.Ct. 349, 48 L.Ed. 525 (1904); *Arjay Assocs., Inc. v. Bush,* 891 F.2d 894, 896 (Fed.Cir.1989) ("It is beyond cavil that no one has a constitutional right to conduct foreign commerce in products excluded by Congress."). As a result, courts have repeatedly rebuffed substantive due process challenges by importers to statutes which restrict or even prohibit importation:

> As a result of the complete power of Congress over foreign commerce, it necessarily follows that no individual has a vested right to trade with foreign nations which is so broad in character as to limit and restrict the power of Congress to determine what articles of merchandise may be imported into this country and the terms upon which a right to import may be exercised. This being true, it results that a statute which restrains the introduction of particular goods into the United States from consideration of public policy does not violate the due process clause of the Constitution.

*Buttfield,* 192 U.S. at 493, 24 S.Ct. 349; *see also The Abby Dodge,* 223 U.S. 166, 176–77, 32 S.Ct. 310, 56 L.Ed. 390 (1912); *Arjay Assocs.,* 891 F.2d at 897 ("Appellants cite not one decision, and we are aware of none in the 200 years of our judicial history, which has upheld any right of persons in appellants' position to overturn a Congressional exclusion of any product from importation.").

■■■ Nonetheless, an importer may be entitled to procedural due process regarding the resolution of disputed facts involved in a case of foreign commerce when the importer faces a deprivation of "life, liberty, or property" by the Federal Government. "The Due Process Clause requires a hearing of some kind ... when government deprives an individual of 'life, liberty, or property' based on resolution of contested factual issues concerning that individual...." 2 Kenneth C. Davis & Richard J. Pierce, Jr., *Administrative Law Treatise* § 9.2, at 3 (3d ed.1994); *see also United States v. Florida East Coast Ry. Co.,* 410 U.S. 224, 93 S.Ct. 810, 35 L.Ed.2d 223 (1973).

The trial court held that NEC's Constitutional due process claim failed because NEC had no legally cognizable right, property or otherwise, to engage in foreign commerce. NEC's claim, however, was not a challenge to the Government's legislative power to regulate NEC's conduct in foreign commerce, as in *The Abby Dodge, Arjay,* and the other cases relied on by the trial court. Instead, NEC claims that the determination of certain contested facts regarding the pending antidumping investigation against it was tainted by prejudgment. This is a procedural due process claim of the kind generally cognizable under the Fifth Amendment of the Constitution.

In recent years the Supreme Court has abandoned the earlier narrow reading of "rights" subject to constitutional protection, and extended constitutional coverage to some statutory entitlements previously thought of as "privileges." *See, e.g., Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) (welfare benefits); *Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975) (suspension from school); *see also Board of Regents v. Roth,* 408 U.S. 564, 571, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) ("[T]he Court has fully and finally rejected the wooden distinction between 'rights' and 'privileges' that once seemed to govern the applicability of procedural due process rights."). Although the Court has not gone so far, commentators have argued that the Framers intended "life, liberty, and property" to be read as a single term that refers to "all interests valued by sensible men." Henry Monaghan, *Of "Liberty" and "Property,"* 62 Cornell L.Rev. 405, 409 (1977). (*See* 2 Davis & Pierce, *supra,* § 9.4, for a discussion of the interests which have been held protected, and those that have not, and the view that the Court's line-drawing jurisprudence in this area is not entirely satisfactory.)

The trial court avoided immersing itself in that debate by concluding that, though no constitutionally-protected right might exist, there inheres in the statutory scheme created by Congress an implicit expectation that governmental decision makers will act honestly and fairly in the performance of their duties. The court noted the presumption, rebuttable, that their actions are so motivated. From this, the trial court discerned an

applicable procedural standard not unlike that of constitutional due process.

We share the trial court's commitment to the proposition that there inheres in a statutory scheme such as this an expectation that those charged with its administration will act fairly and honestly. That proposition is not based on blind hope or naiveté, but on a shared expectation of how the Government will conduct itself. *See, e.g., Parsons v. United States,* 229 Ct.Cl. 335, 670 F.2d 164, 166 (1982) ("It is well established that there is a presumption that public officers perform their duties correctly, fairly, in good faith, and in accordance with law and governing regulations, and the burden is on the plaintiff to prove otherwise."); *Haley v. Department of the Treasury,* 977 F.2d 553, 558 (Fed.Cir. 1992).

In the context of this case, however, we need not decide whether the obligation imposed on the Government to deal honestly and fairly with those who come before it arises from the existence of the law itself and the implicit assumptions about how Congress intends Government decision makers to conduct themselves, *see Parsons,* 670 F.2d at 166, or resides in a constitutionally-protected liberty or property interest of an importer who accepts the Government's invitation to engage in commerce within the United States pursuant to the laws thereof, *see Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 541, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985) (" 'While the legislature may elect not to confer a property interest in [public] employment, it may not constitutionally authorize the deprivation of such an interest, once conferred, without appropriate safeguards.' ") (quoting *Arnett v. Kennedy,* 416 U.S. 134, 167, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974) (Powell, J., concurring in part and concurring in result in part)); *cf. Steel Co. v. Citizens for a Better Env't,* —— U.S. ——, ——, 118 S.Ct. 1003, 1021, 140 L.Ed.2d 210 (1998) (Stevens, J., concurring) ("Because it is always prudent to avoid passing unnecessarily on an undecided constitutional question, the Court should answer the statutory question first." (citation omitted)). There can be no doubt that arbitrary administration of the law is subject to judicial intervention; it is enough

for us to here conclude that NEC is due a fair and honest process; the question that remains, then, is what process is due.

2.

■ The right to an impartial decision maker is unquestionably an aspect of procedural due process. *See Withrow v. Larkin,* 421 U.S. 35, 47, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975); *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955) ("A fair trial in a fair tribunal is a basic requirement of due process."). This applies to administrative proceedings as well as judicial trials. *See Gibson v. Berryhill,* 411 U.S. 564, 579, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973).

But the blend of investigative and adjudicative functions sometimes found in modern administrative agencies requires that a pragmatic approach be taken to what qualifies as an "impartial" decision maker. As the Government notes, neither the Court of International Trade nor this court previously has addressed the proper legal standard to be applied in a prejudgment claim involving Commerce's antidumping duty proceedings. NEC offers the following articulation of the prejudgment standard: "the test to be applied is whether objective facts reveal that the decision maker has *'in some measure'* prejudged the issues presented in a subsequent administrative hearing." *Brief for Plaintiffs–Appellants* 28. Under this standard, "a prejudgment claim must be sustained if there is even the *appearance* of unfairness." *Id.* at 29.

As an abstract proposition, NEC's proposed standard is a goal to which all government decision makers might aspire. However, as a practical matter, we are not persuaded that NEC's standard is the correct one when imposed on administrative agencies charged with the duty both to investigate and then judge. First of all, this strict standard is inconsistent with prior prejudgment cases. A leading case on the question of agency prejudgment is *Withrow v. Larkin,* upon which both parties rely and to which we now turn.

Wisconsin statutes established a State Examining Board, composed of practicing physicians, to license and discipline physicians.

When charges against a physician were filed with the Board, the Board first held an investigative proceeding to consider the charges, and then, if it determined the evidence warranted, held a "contested hearing" to determine whether the charges should be sustained, and, if so, the appropriate penalty, which could include revocation of license. *See Withrow,* 421 U.S. at 37–38, 95 S.Ct. 1456. The district court held that such a proceeding was a denial of an accused doctor's procedural due process rights because the Board did not qualify as an independent decision maker. *See id.* at 46, 95 S.Ct. 1456. The Supreme Court reversed.

Drawing the distinction between previous knowledge of the facts and an advance commitment about them, the Court concluded that this combination of investigating and judging was not a denial of due process under the circumstances. The Court acknowledged that permitting those who investigate to then sit in judgment raises a substantial issue. However, the Court pointed out that that is not a new issue, and legislators and others concerned with the operations of administrative agencies have given much attention to whether and to what extent distinctive administrative functions should be performed by the same persons. Concluding that "[t]he incredible variety of administrative mechanisms in this country will not yield to any single organizing principle," *id.* at 52, 95 S.Ct. 1456, the Court looked instead at the various situations which have been identified "in which experience teaches that the probability of actual bias on the part of the judge or decision maker is too high to be constitutionally tolerable," *id.* at 47, 95 S.Ct. 1456.

The Court cited cases in which the adjudicator has a pecuniary interest in the outcome, and those in which the adjudicator has been the target of personal abuse or criticism from the party before him, as examples of unacceptable risk of bias. On the other hand, the Court did not find the risk of prejudgment resulting from having the investigator also as the adjudicator a risk that was, per se, too high. The Court cited to *FTC v. Cement Inst.,* 333 U.S. 683, 68 S.Ct. 793, 92 L.Ed. 1010 (1948), in which the Court

had held that even though members of the Commission had publicly stated views contrary to the plaintiff's position, "the fact that the Commission had entertained such views as a result of its prior ex parte investigations did not necessarily mean that the minds of its members were irrevocably closed on the subject." *Id.* at 701, 68 S.Ct. 793.

The Court also cited favorably to *Richardson v. Perales,* 402 U.S. 389, 410, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971), a case rejecting a due process objection to the multiple roles—investigator and adjudicator—of the Examiner under the Social Security System. The Court noted that "the challenge to this combination of functions 'assumes too much and would bring down too many procedures designed, and working well, for a governmental structure of great and growing complexity.'" *Withrow,* 421 U.S. at 49–50, 95 S.Ct. 1456.

Nor is a decision maker disqualified simply by making a public statement concerning the case, *see Hortonville Joint Sch. Dist. No. 1 v. Hortonville Educ. Ass'n,* 426 U.S. 482, 493, 96 S.Ct. 2308, 49 L.Ed.2d 1 (1976); *FTC v. Cinderella Career & Finishing Sch., Inc.,* 404 F.2d 1308, 1315 (1968), even when that statement is made before Congress, *see Cement Inst.,* 333 U.S. at 702–703, 68 S.Ct. 793. Other administrative cases have also rejected prejudgment claims despite what could be characterized as prejudgment "in some measure" giving rise to the "appearance of unfairness." *See, e.g., Hortonville,* 426 U.S. at 493, 96 S.Ct. 2308; *Cement Inst.,* 333 U.S. at 702–703, 68 S.Ct. 793; *United States v. Morgan,* 313 U.S. 409, 421, 61 S.Ct. 999, 85 L.Ed. 1429 (1941).

We recognize that many of these cases deal with decision-making by multiple-member boards, whereas our case involves a single administrative decision maker. We do not see that this difference should call for a different assessment of the behavior involved. Thus, it is difficult to resolve these outcomes with the standard that NEC advocates. We would be blinding ourselves to the reality of the administrative process that Congress has created were we to hold that the mere fact that a decision maker has been involved in the development of the case, ei-

ther through a field investigation or a public hearing, or indeed has taken, preliminarily, a public position on the case, is enough to place the entire process under a constitutional cloud from which it cannot be shielded.

On the other hand, the shield the Government proposes for its agents is one that would require the plaintiff to show "that plaintiff's participation in the administrative process would be futile." The Government rightly characterizes its standard as "a difficult one to sustain." Fortunately we need not choose between these polar versions of what is to be expected from a Government decision maker; Supreme Court case law suggests a useful standard by which we may judge NEC's claim of prejudgment without necessarily establishing a standard for all time and for all cases.

■ NEC can prevail on its claim of prejudgment only if it can establish that the decision maker is "not 'capable of judging a particular controversy fairly on the basis of its own circumstances.'" *Hortonville,* 426 U.S. at 493, 96 S.Ct. 2308 (quoting *Morgan,* 313 U.S. at 421, 61 S.Ct. 999). This standard is met when the challenger demonstrates, for example, that the decision maker's mind is "irrevocably closed" on a disputed issue. *Cement Inst.,* 333 U.S. at 701, 68 S.Ct. 793. This standard is appropriate in this case for two reasons.

■ The first is that "administrators 'are assumed to be men of conscious and intellectual discipline, capable of judging a particular controversy fairly on the basis of its own circumstances.'" *Withrow,* 421 U.S. at 55, 95 S.Ct. 1456 (quoting *Morgan,* 313 U.S. at 421, 61 S.Ct. 999). Were we routinely to accept challenges to the administrative decision-making process based on claims of prejudgment, we would undermine the presumption that administrators fulfill their obligations with the highest level of integrity and honesty.

The second, more practical reason, is that the administrative process must have the flexibility necessary to accomplish its mission. Although "we should be alert to the possibility of bias that may lurk in the way particular procedures actually work in practice," *Withrow,* 421 U.S. at 54, 95 S.Ct. 1456, we are reluctant to circumvent the normal administrative procedure absent a showing that the decision maker's mind is "irrevocably closed."

The antidumping system is a good example of the need for such flexibility. First of all, an antidumping investigation is bifurcated: Commerce makes less-than-fair value determinations for a class or kind of foreign merchandise, and the ITC makes injury determinations. Only if Commerce determines that the merchandise is being sold at less-than-fair value ("LTFV"), *see* 19 U.S.C. § 1673(1) (1994), *and* the ITC determines that a domestic industry is materially injured or is threatened with material injury, *see* 19 U.S.C. § 1673(2), does Commerce issue an antidumping order. *See* 19 U.S.C. § 1673. This bifurcation reduces the risk that an improper bias will deprive importers of their due process rights.

Second, the investigation within Commerce proceeds in two stages—a preliminary determination and a final determination. *See* 19 U.S.C. §§ 1673b(b), 1673d(a) (1994). The purpose of the preliminary determination is to ascertain whether there is a reasonable basis to believe or suspect that the subject merchandise is being sold, or is likely to be sold, at LTFV. *See* 19 U.S.C. § 1673b(b); 19 C.F.R. § 353.15 (1997). This triggers an opportunity for the affected parties to participate actively in the process, after which Commerce proceeds to make its final determination. *See* 19 U.S.C. § 1673d(a); 19 C.F.R. § 353.20 (1997). Both the preliminary and final determinations are based on information presented to or obtained by Commerce during the course of the proceeding. *See* 19 U.S.C. § 1516a(b)(2) (1994). Commerce may not base its decision on information outside the record. *See id.* Thus, even if Commerce is exposed to improper influences outside the record, it is prohibited from acting upon them.

There are also statutory and regulatory protections for importers. Commerce is required by statute to hold a hearing at the request of any interested party prior to its final determination. *See* 19 U.S.C. § 1677c (1994); 19 C.F.R. § 353.38(b) (1997). Com-

merce is required by statute to address the arguments made at the hearing regarding the proper methodology for the dumping calculation. *See* 19 U.S.C. § 1677f(i)(3)(A) (1994). An interested party is also not limited to giving oral testimony. The antidumping statute permits a party to an investigation to submit written materials, it requires Commerce to consider such materials and, if Commerce finds them to be deficient, to afford the importer the opportunity to supplement its submission. *See* 19 U.S.C. §§ 1677m(d)-(e) (1994). Interested parties also have the opportunity to submit factual information to rebut, clarify, or correct the submissions of another interested party. *See* 19 C.F.R. § 353.31 (1997). Additionally, Commerce is required to "verify all information relied upon in making a final determination of an investigation." 19 U.S.C. § 1677m(i)(1) (1994); 19 C.F.R. § 353.36(a)(i) (1997). Though there is no way to prevent a government official bent on doing mischief from secretly prejudging a matter, these elaborate procedural protections substantially reduce the likelihood that such prejudgment will survive. *See Withrow,* 421 U.S. at 54, 95 S.Ct. 1456.

We are particularly reluctant to hold Commerce to the stringent prejudgment standard advocated by NEC in light of the two stages of an investigation. Because Commerce must publish its preliminary results, it must take an initial public position on the disputed issues in the investigation. However, because interested parties are given the opportunity to comment on those results, and because Commerce is required to respond to them, it is not uncommon for Commerce to modify its position between the preliminary determination and the final determination.[4] Therefore, in an antidumping investigation, "[t]he risk of bias or prejudgment in this sequence of functions has not been consid-

ered to be intolerably high or to raise a sufficiently grave possibility that the adjudicators would be so psychologically wedded to their complaints that they would consciously or unconsciously avoid the appearance of having erred or changed position." *Withrow,* 421 U.S. at 57, 95 S.Ct. 1456. Were we to impose a strict prejudgment standard, we risk upsetting this intricate system that Congress developed in exercising its broad power over foreign commerce. The fact that the final decision maker in this case—Mr. LaRussa—was to a large extent insulated from the earlier machinations within the Department weighs importantly against the fixed mindset thesis.

The judiciary also provides an independent check on Commerce. An importer may appeal from Commerce's final determination to the United States Court of International Trade. *See* 28 U.S.C. § 1581(c) (1994); 19 U.S.C. § 1516a(a)(2)(B)(i) (1994). That court reviews Commerce's determination for substantial evidence. *See* 19 U.S.C. § 1516a(b)(1)(B)(i) (1994). If the importer is dissatisfied with that result, it can appeal the court's final decision to this court, *see* 28 U.S.C. § 1295(a)(5) (1994), where we again apply the substantial evidence test to Commerce's decision, *see Atlantic Sugar, Ltd. v. United States,* 744 F.2d 1556, 1559 n. 10 (Fed.Cir.1984); *Micron Tech., Inc. v. United States,* 117 F.3d 1386, 1392–93 (Fed.Cir. 1997).[5] The availability of this level of review significantly lessens the risk that an impermissible bias will infect Commerce's decision-making process, or if it does, that such a decision will withstand scrutiny.

### 3.

NEC has failed to demonstrate that the decision maker, here Mr. LaRussa, was not capable of judging this particular contro-

---

**4.** *Compare Certain Parts From Italy,* 61 Fed.Reg. 1,344, 1,351 (Dep't Commerce 1996) (preliminary determination of 22%) *with* 61 Fed.Reg. 42,231, 42,232 (final determination of 0%); *compare Polyvinyl Alcohol From the People's Republic of China,* 60 Fed.Reg. 52,547, 52,649 (Dep't Commerce 1995) (preliminary determination of 187.56%) *with* 61 Fed.Reg. 14,057, 14,063 (final determination of 0%); *compare Manganese Metal From the People's Republic of China,* 60 Fed.Reg. 37,875 (amended preliminary determination of

82.44%) *with* 61 Fed.Reg. 4,415, 4,418 (amended final determination of 0%).

**5.** *But see Zenith Elecs. Corp. v. United States,* 99 F.3d 1576, 1583 (Fed.Cir., 1996) (Rader, J., concurring) (suggesting that the standard articulated in *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 491, 71 S.Ct. 456, 95 L.Ed. 456 (1951) is the more appropriate standard of review).

versy fairly on the basis of its own circumstances. Each of the statements that NEC points to as evidence of prejudgment were qualified. Ms. Esserman's oral advice given to NSF at the May 13 meeting, according to the testimony of Mr. Rudolph, NSF's general counsel, who was in attendance, "was based on the preliminary analysis as understood to date." Mr. Mannion's contemporaneous letter to UCAR, in which he referred to Commerce's analysis as "constructive" and its conclusion "preliminary," supports this. Although someone on her staff prepared an outline for her presentation that purported to summarize Commerce's "find[ing] that dumping is occurring at significant levels, ranging from approximately 100–300 percent," Ms. Esserman testified that she did not use these "talking points" at the May 13th meeting because she thought they were "inappropriate." The trial court credited her testimony; and we cannot say this was error.

Neither the Predecisional Memorandum nor the Joffe letter will support the weight NEC places upon them. The Joffe letter on its face is equivocal, using words of qualification such as "estimated," "could," and "likely." The Predecisional Memorandum is not definitive. The title itself suggests that the results contained therein were made prior to any formal analysis, and that any conclusions stated were intended to precede the decisional process. The memorandum was not based on NEC's actual cost data, but on data contained in public and other governmental sources. The marketing costs, for example, were based on "Industry standards," not on actual NEC cost data. The cost figures, which would likely be the most critical disputed factual issues in an actual antidumping investigation, were listed as "estimates." There is nothing in the memorandum or the accompanying letter that indicates that Commerce would not reconsider these figures once they were presented with actual data. Accordingly, they do not either separately or cumulatively establish that Mr. LaRussa's mind was "irrevocably closed."

NEC argues that once Commerce had to justify its analysis to Congress, that "backed the Department further into a corner, and dragged Mr. LaRussa there with it." *Brief of Plaintiffs–Appellants* 34. We are not persuaded. The statements made by Commerce officials in their briefings to Congress were not of a nature or made in such context as "to raise a sufficiently grave possibility that the adjudicators would be so psychologically wedded to their complaints that they would consciously or unconsciously avoid the appearance of having erred or changed position." *Withrow,* 421 U.S. at 57, 95 S.Ct. 1456. Congress, and presumably its staff, know how the antidumping laws work. At the time the briefings took place, it no doubt knew that no preliminary, let alone final, determination had been made. Whatever doubt there was about this was assuaged by Mr. Taverman's testimony, who testified that he spoke in broad, qualified generalities, not precise terms. Neither Mr. Taverman, Ms. Esserman, nor any other Commerce official made the type of unequivocal statement that would establish that Commerce had made up its mind. Accordingly, NEC has failed to satisfy its burden to prove that Mr. LaRussa was incapable of judging this particular controversy fairly on the basis of its own circumstances.

### C.

Finally, NEC asserts that the trial court erred in limiting the testimony of Mr. LaRussa and Mr. Eizenstat. We review such evidentiary rulings for abuse of discretion. *See Heat & Control Inc. v. Hester Indus., Inc.,* 785 F.2d 1017, 1022 (Fed.Cir. 1986). No such abuse of discretion has been shown. The trial court permitted discovery of Mr. LaRussa and Mr. Eizenstat in the form of written interrogatories. In light of Mr. LaRussa's ongoing involvement in the supercomputer investigation and Mr. Eizenstat's high-ranking position, we agree with the trial court that such limitations were appropriate in order to protect the deliberative process from undue interference. *See Morgan,* 313 U.S. at 422, 61 S.Ct. 999; *In re Office of Inspector General,* 933 F.2d 276, 278 (5th Cir.1991); *Simplex Time Recorder Co. v. Secretary of Labor,* 766 F.2d 575, 586 (D.C.Cir.1985) (absent "extraordinary circumstances," high agency officials should not "be called to testify regarding their reasons for taking official action").

## D.

Our conclusion that NEC has failed to establish an invalidating prejudgment on the part of the government officials involved is not a statement that the conduct of these officials is to be emulated. But for the fortuitous intervention at the final stages of the process of a different decision maker the outcome could well have been different. Thus NEC is not without grounds for feeling aggrieved. Presumably it entered into the competition for the UCAR contract on the supposition that the vendor with the best product for the lowest cost would win. Then it ran into a high-level political buzz-saw apparently motivated by a desire to protect a domestic industry. But the entire system that Congress has established under the Tariff Acts is designed to protect domestic industries from "unfair" foreign competition, and that is a policy decision that the Constitution places in Congress' hands. The law requires that, in implementing that policy, the administrative decision maker play the game within the rules Congress has established, and that means making final decisions by applying the law to the facts before the agency, not on the basis of xenophobic arguments or distorted facts.

In this case, NEC chose to withhold whatever facts it might have favorable to its cause, and to allow Commerce to proceed to its final decision on the basis of the available information. That decision, which found dumping to be present with regard to certain supercomputers, including NEC's, is now up for review on the merits. NEC will have whatever opportunity is open to it to challenge Commerce's determination on the merits.

It is hard to argue with the proposition that it would have been preferable for Commerce to await a request in the usual course before inserting itself into the UCAR procurement, if for no other reason than that this lawsuit would have been avoided. That Commerce yielded to pressure to get involved at a preliminary stage in the matter does not alone establish that the final outcome was pre-ordained. After a thorough review of all the events, and weighing their implications in light of the policies represented in the Tariff Acts, we are not persuaded that the process here fell so short.

## CONCLUSION

The judgment of the United States Court of International Trade is *AFFIRMED.*

## COSTS

Each party to bear its own costs.