## PARISH *v.* UNITED STATES.

1. The acts of the Assistant Surgeon-General, appointed under the act of Congress and located at St. Louis, are the acts of the Surgeon-General, and have the same validity until countermanded or revoked.
2. Where parties in the effort to fulfil an order for a large amount of ice for the use of the government, which by their contract they were bound to furnish, purchased ice which was lost by the *suspension* of the order of the Assistant Surgeon-General by his superior officer, they are entitled to recover the cost of the ice so lost and the expense of the care and attempt to preserve it.

APPEAL from the Court of Claims.

The facts are stated in the opinion of the court.

*Mr. John B. Sanborn* and *Mr. Ralph P. Lowe* for the appellant.

*The Solicitor-General, contra.*

MR. JUSTICE MILLER delivered the opinion of the court.

This action was commenced in the Court of Claims, under an act of Congress specially authorizing it, approved May 31, 1872.

There is nothing in the act which furnishes any rule for its decision, though some of its provisions are emphasized in the argument of counsel. The action was brought on the following contract : —

" Article of agreement made this fifth day of March, 1863, between Henry Johnson, medical store-keeper, United States army, and acting medical purveyor, Washington, D. C., on the one part, and Joseph W. Parish and William L. Huse, comprising the firm of Joseph W. Parish & Co., of the city of St. Louis, State of Missouri, of the other part, witnesseth : —

" That the said Henry Johnson, medical store-keeper United States army, for and on behalf of the United States of America, and the said Joseph W. Parish and William L. Huse, comprising the firm of J. W. Parish & Co., for themselves, their heirs, executors, and administrators, have mutually agreed, and by these presents do mutually covenant and agree, to and with each other, in the manner following, viz. : —

" *First,* That said J. W. Parish & Co. shall deliver at Memphis, Tennessee ; Nashville, Tennessee ; St. Louis, Missouri ; and Cairo, Illinois, the whole amount of ice required to be consumed at each

respective point and vicinity during the remainder of the year 1863. Ice to be in quality A No. 1, and delivered at two thousand (2,000) pounds to the ton.

" *Second*, That for each and every ton of ice delivered at Nashville, Tennessee, and accepted by the medical officer in charge, the said J. W. Parish & Co. shall receive the sum of twenty-five dollars ($25).

" *Third*, That for each and every ton of ice delivered at St. Louis, Missouri, and accepted by the medical officer in charge, the said J. W. Parish & Co. shall receive the sum of sixteen dollars ($16).

" *Fourth*, That for each and every ton of ice delivered at Cairo, Illinois, and accepted by the medical officer in charge, the said J. W. Parish & Co. shall receive the sum of twenty dollars ($20).

" *Fifth*, That for each and every ton of ice delivered at Memphis, Tennessee, and accepted by the medical officer in charge, the said J. W. Parish & Co. shall receive the sum of twenty dollars ($20).

" *Sixth*, All the ice delivered under this contract to be subjected to the inspection and approval of the medical officer in charge of the post where it is delivered, and such as does not conform to the specifications set forth in this contract shall be rejected.

" *Seventh*, That payments shall be made from time to time on receipted bills of lading and duplicate accounts certified to by the medical officer in charge of the post where it is delivered.

" *Eighth*, No member of Congress shall be admitted to any share herein or any benefit to arise therefrom.

" *Ninth*, It is further agreed that the said J. W. Parish & Co. will allow three (3) working days for discharging each cargo at either one of the points before mentioned; after that time demurrage to be allowed by the said Henry Johnson, medical storekeeper, United States army, as per charter-party or bill of lading of the vessel.

" In witness whereof, the undersigned have hereunto placed their hands and seals the day and date above written.

[SEAL.]                    " HENRY JOHNSON,
                  " *Med. Store-keeper U. S. A. Acting Med. Purveyor.*
                    " J. W. PARISH & Co."

Under this contract, there was delivered and paid for by the government, at the stipulated prices, 12,768 tons of ice, about which there is no dispute.

The controversy grows out of the following correspondence and the acts of parties under it : —

"ASSISTANT SURGEON-GENERAL'S OFFICE,

"ST. LOUIS, MISSOURI, March 25, 1863.

" Messrs. J. W. PARISH & Co. :

" GENTLEMEN,— I am instructed by the Assistant Surgeon-General to direct that the ice which you have agreed to deliver at the points designated in your contract shall be distributed in the following quantities, viz. : —

| | |
|---|---:|
| "At St. Louis | 5,000 tons, |
| "At Cairo | 5,000 tons, |
| "At Memphis | 10,000 tons, |
| "At Nashville | 10,000 tons, |

making the total of 30,000 which you have contracted to deliver. The ice to be delivered at Nashville and Memphis is for the use of the sick of the armies in the field, and should be furnished without delay.

"Very respectfully, your ob't servant,

"By order of the Assistant Surgeon-General :

(Sig.)      "JOSEPH B. BROWN,

"*Surgeon United States Army.*"

A copy of this order being received at the Surgeon-General's office, the following telegram and letter were sent to Assistant Surgeon-General Wood : —

"SURGEON-GENERAL'S OFFICE,

"March 31, 1863.

" Parish & Co. have not contracted for 30,000 tons of ice. Suspend the order you gave him.

(Sig.)      "W. A. HAMMOND, *Surgeon - General*

" Col. R. C. WOOD,

    "*Asst. Surgeon-General U. S. Army, St. Louis.*"

"SURGEON-GENERAL'S OFFICE,

"WASHINGTON, D. C., March 31, 1863.

" SIR,—Your communication of the 25th instant to J. W. Parish & Co., in regard to the quantities of ice to be delivered at the different points for which they contract, forwarded to this office for the information of the Surgeon-General, has been received.

" I am instructed to inform you that the contract with Parish &

Co. was made for such quantities as might be needed; and that the ice should be .ordered from them, from time to time, to different points, in .lots of a few hundred tons, as needed.

"Very respectfully, your obedient servant,

"C. H. Alden, *Assistant Surgeon, U. S. A.*

"Col. R. C. Wood,

"*Assistant Surgeon-General, St. Louis, Mo.*"

"Assistant Surgeon-General's Office,
.       "St. Louis, Missouri, March 31, 1863.

"To J. W. Parish & Co. (Care C. H. Wicker & Co.),

"Chicago, Ill.:

"I am instructed by the Surgeon-General to suspend the order I have given you till further instructions are given from him.

'(Sig.)        "R. C. Wood, *Asst. Surgeon-General.*"

In the finding of facts by the Court of Claims, it is said that it does not appear that this last despatch was received by the claimants, though they had knowledge of the notice by oral information from the Assistant Surgeon-General at St. Louis, on the second day of April.

The sixth finding of fact by the Court of Claims, which is also important, is thus stated:—

"Prior to the delivery to the said Parish of Joseph B. Brown's letter of March 25, 1863, set forth in finding V, the said Parish had purchased for delivery under the contract sued on 8,100 tons of ice; and after the delivery of said letter to him, he set about purchasing ice for delivery in pursuance of said letter; and thereafter, and before he was, on the second day of April, 1863, apprised of the aforesaid order of Surgeon-General Hammond, of March 31, he had purchased or contracted for the purchase of 23,000 tons of ice."

If we add to this that 10,000 tons of this latter purchase was made at Lake Pepin, on the upper Mississippi River, which was stored there at the time and which became a total loss, and that the order of the Surgeon-General *suspending* the order of the Assistant Surgeon-General remained in that condition and has never been revoked or modified, we have the main elements on which the case was decided in the court below by, dismissing the claimants' petition.

The petitioners claim to recover the contract price of the

entire 30,000 tons, after deducting what they have been paid and the reasonable cost of delivering the ice not received by the government.

The opinion of the Court of Claims found in the record bases the dismissal of the petition on the ground that the Assistant Surgeon-General, in making the order on claimants for the 30,000 tons of ice, was acting so wholly without authority, that Parish & Co. had no right to treat it as of any validity or as one which they were bound to regard. In the argument of the case before us, the counsel for government abandons this view of the matter, and, we think, very properly. We apprehend if the case were reversed, and the United States were suing for damages incurred by a refusal of the contractors to conform to this order, the amount specified being needed and not forthcoming, there would be no question of the validity of the notice of the Assistant Surgeon-General.

The office of Surgeon-General is one of the distinct or separate bureaus of the administrative service of the War Department. It has been found, in regard to many of these bureaus, and even to the heads of departments, that it is impossible for a single individual to perform in person all the duties imposed on him by his office. Hence statutes have been made creating the office of assistant secretaries for all the heads of departments.

It would be a very singular doctrine, and subversive of the purposes for which these latter offices were created, if their acts are to be held of no force until ratified by the principal secretary or head of department. It was to relieve the overburdened principal of some part of those duties that the office of assistant was created. In the immense increase of business in the office of Surgeon-General during the war, similar relief was found necessary, and the office of Assistant Surgeon-General was created.

For the very reason that the prompt exercise of the powers of the bureau was essential in the field of operations of the army, the assistant in this case was located at St Louis, over a thousand miles from the city of Washington. He was appointed for the purpose of exercising, at that place, the functions of the office of Surgeon-General. He was by law the

Assistant Surgeon-General. If no virtue attached to his acts until approved by the Surgeon-General in Washington, any inferior clerk would have answered the purpose as well. It is not intended to deny that he was subordinate to the chief of his bureau; could be ordered to do or not to do particular things; and when an order made by him was disapproved, it might be revoked by that officer. But until so revoked or disapproved it was valid, and parties required to act under it had a right to rely on it.

The order of the 25th of March, made within twenty days after the contract was signed, was an unequivocal demand, under that instrument, that the amount of 30,000 tons, part of an unlimited quantity which might have been required of the contractor, should be delivered as therein directed. No one familiar with the climate and the sources of supply could doubt that, to enable him to fulfil this demand, made at that season, required promptitude and diligence in securing the ice. If claimants had failed to have the amount thus demanded ready for use when required, the officers of the government would have procured it at any price in the market, a price which would have been enormously enhanced by this very demand, and the claimants would have been liable for the difference between what the government paid under these circumstances and the price fixed in the agreement. They were therefore under an imperative necessity to prepare to fulfil this requirement.

Impelled by this necessity, the Court of Claims finds that between the time they received the order and the second day of April, when they first learned of its suspension by the Surgeon-General, they purchased over 23,000 tons of ice. They were then informed, not that the order was revoked, but that it was suspended. It never was revoked. It remained suspended until the time during which the entire delivery was to be made was passed; and during that time 10,000 tons of the ice melted away at Lake Pepin, and was a total loss. As we have already stated, 12,768 tons were delivered and paid for; 10,000 tons perished by melting. What became of the 7,232 tons, neither received by the government nor lost at Lake Pepin, is not disclosed by the record, nor whether claimants

made by selling it to others or lost by it, in that or any other way.

What are the rights of the parties under these circumstances?

If claimants intended to treat the matter as a completed contract to deliver 5,000 tons at St. Louis, 5,000 at Cairo, 10,000 at Memphis, and 10,000 at Nashville, after the order of Brown, and to hold the government to the contract price for all those amounts, they should have delivered, or tendered, or offered to deliver, and demanded payment.

If the order had been revoked instead of suspended, and they intended to deny the right of the government to revoke it, they must clearly have offered a delivery to make the government liable. Had they offered to deliver, and been in condition to deliver, or, to use the old forms of declaration, if they had shown that they were ready and willing to deliver after such revocation, it would still remain a question as to the measure of damages, or rather, whether the government did not have a right to countermand the order and pay for what it actually received, and the necessary loss of claimants from the change of the order.

In point of fact, the order was never revoked but suspended, so that the claimants could not tell whether it would be revoked or revived, and they never made, or offered to make, delivery of the amount demanded by that order. The government did require, accept, and pay for part of it. The balance was never delivered or tendered.

Without elaborating the matter, we are of opinion that, as the claimants neither delivered or offered to deliver the remainder, they cannot recover either the contract price or the profits they might have made if they had done so. And as the government left the demand suspended, so that while claimants were compelled to purchase under the original order, and could not safely dispose of it while it remained unrevoked, they are entitled to recover what they paid for the ice that was lost, and what expense they were at in making the purchase and in keeping it until it was lost. So if they lost any thing on the other ice not purchased at Lake Pepin, but purchased before they learned of the order of suspension, they should recover that.

*Bulkley* v. *United States* (19 Wall. 37) is an analogous case. Bulkley had contracted to do all the transportation of supplies from Fort Leavenworth to army posts further west which might be required of him by the government. He was notified that 1,700,000 pounds would be needed, and made large preparations to meet this requirement. The United States did not need half this amount, and the freight was not delivered to him. He claimed the profits which he would have made by the terms of the contract if the freight had been delivered and carried. This court said he could not recover profits, but that, " in making ready to meet the requirements of the notice, he was subjected to the loss of time, to trouble and expense. He is entitled to be paid accordingly."

We think the case before us comes within that principle. Claimants are entitled to the expenses and losses incident to the preparation to meet the demand of the notice served on them. The cost of the ice purchased at Lake Pepin and lost, the expense bestowed upon its care, and the time and expense of making that purchase, and any sum actually lost in regard to the other 7,232 tons of ice purchased to enable them to meet that requirement, must form the measure of plaintiffs' recovery. Because these are not found by the Court of Claims, the judgment of that court will be reversed and the case remanded, that their damages may be ascertained and judgment rendered accordingly ; and it is

*So ordered.*